UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RAMON SUERO and ROSANNA SUERO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FEDERAL HOME LOAN MORTGAGE CORP. | ) | CIVIL ACTION |
| a/k/a FREDDIE MAC, | ) | NO. 13-13014-JGD |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| FEDERAL HOUSING FINANCE AGENCY, | ) | |
| | ) | |
| Intervenor. | | |

## MEMORANDUM OF DECISION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

August 18, 2015

DEIN, U.S.M.J.

### I.  INTRODUCTION

The plaintiffs, Ramon and Rosanna Suero (the "Sueros"), have brought this action

against the Federal Home Loan Mortgage Corporation, commonly known as "Freddie Mac," in

order to challenge Freddie Mac's refusal to sell their foreclosed home to Boston Community

Capital ("BCC"), a not-for-profit lender that purchases foreclosed homes at their current fair

market value, and resells or leases them back to the former homeowners.  At the time it

refused to sell the Sueros' former property to BCC, Freddie Mac was carrying out policies that

prohibited it from selling foreclosed real estate to entities that intended to resell the property

to the former borrower.  By their claims in this action, the Sueros allege, inter alia, that Freddie

Mac's implementation of those policies violates the Non-Profit Buyback Provision of the

Massachusetts Foreclosure Law, Mass. Gen. Laws ch. 244, § 35C(h) ("Section 35C(h)"), and

constitutes an unfair or deceptive act or practice that violates Mass. Gen. Laws ch. 93A

("Chapter 93A").  Since 2008, the Federal Housing and Finance Agency ("FHFA" or "Agency")

has been acting as both the regulator and Conservator of Freddie Mac pursuant to the Housing

and Economic Recovery Act, 12 U.S.C. § 4501 et seq. ("HERA").  FHFA has intervened in this

action, and is participating in the defense of the claims that the Sueros have brought against

Freddie Mac.[1]

The matter is presently before the court on the "Plaintiffs' Motion for Partial Summary

Judgment" (Docket No. 46).  It is also before the court on Freddie Mac's and FHFA's "Cross-

Motion for Partial Summary Judgment" (Docket No. 63).  By their motions, each of the parties

contends that it is entitled to judgment as a matter of law on Count I of the Verified Complaint.

Pursuant to Count I, the Sueros are seeking to hold Freddie Mac liable for the alleged violations

of Section 35C(h) and Chapter 93A, and to obtain declaratory and/or injunctive relief requiring

Freddie Mac to sell the Sueros' former home to BCC.

The threshold issue raised by the parties' cross-motions is whether HERA's anti-

injunction clause precludes this court from considering the plaintiffs' state law claims on the

merits.[2]  That clause provides that "no court may take any action to restrain or affect the

---

[1]  This court will refer to Freddie Mac and FHFA collectively as the "defendants" for purposes of this decision.

[2]  The defendants also argue that HERA preempts the plaintiffs' state law claims, and that even if this court were to reach the merits of those claims, they must fail because Section 35C(h) of the Massachusetts Foreclosure Law does not apply to post-foreclosure matters such as the proposed sale at issue in this case.  (See Def. Mem. (Docket No. 64) at 13-22).  Because this court finds that HERA's anti-injunction provision bars this court from addressing the merits of plaintiffs' claims, the court will not address the defendants' remaining arguments.

exercise of powers or functions of the [FHFA] as a conservator" of Freddie Mac.  12 U.S.C.

§ 4617(f).  The defendants contend that an order compelling Freddie Mac to sell the foreclosed

property to BCC would constitute an unlawful restraint on the Conservator's statutory authority

to dispose of an asset of the conservatorship on terms that it deems appropriate.  In response,

however, the plaintiffs argue that the anti-injunction provision is inapplicable because the

defendants have failed to show that FHFA took any action or exercised its powers as a

Conservator with respect to Freddie Mac's sales of foreclosed homes.

 This is not the first time these issues have arisen in the context of a lawsuit challenging

Freddie Mac's refusal to sell foreclosed property to BCC.  In <u>Massachusetts v. Fed. Hous. Fin.</u>

<u>Agency</u>, the Commonwealth of Massachusetts, by its then-Attorney General, Martha Coakley,

brought claims against Freddie Mac, FHFA and the Federal National Mortgage Association

("Fannie Mae") alleging, <u>inter</u> <u>alia</u>, that Freddie Mac's and Fannie Mae's refusal to sell

foreclosed homes to BCC violated Section 35C(h) of the Massachusetts Foreclosure Law and

constituted an unfair or deceptive business practice in violation of Chapter 93A.  <u>See</u>

<u>Massachusetts v. Fed. Hous. Fin. Agency</u>, 54 F. Supp. 3d 94, 97 (D. Mass. 2014) (the "Common-

wealth Action").  As in this case, the plaintiff in that action sought to enjoin Freddie Mac from

enforcing its policy on sales of foreclosed homes.  <u>Id.</u>  On July 14, 2014, the defendants filed a

motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) & (6) in which they argued that the anti-

injunction provision of HERA barred the court from granting such relief.  <u>Id.</u>  On October 21,

2014, the court (Stearns, J.), issued a decision allowing the motion to dismiss, holding that

HERA's anti-injunction clause applied and that the court lacked authority to consider the

Commonwealth's claims on the merits.  <u>Id.</u> at 101-02.

Following Judge Stearns' issuance of his decision in the Commonwealth Action, this court heard oral argument on the pending motions for summary judgment and took the matter under advisement.  Shortly thereafter, the Commonwealth filed a notice of appeal in the Commonwealth Action.  Because the appeal presented issues that were identical to the issues presented to this court on summary judgment, it was prudent to await a ruling from the First Circuit before addressing the parties' cross-motions.  Accordingly, this court continued to hold the matter under advisement pending a decision from the Court of Appeals.

Eventually, the defendants notified this court that the Commonwealth, by its new Attorney General, Maura Healey, had filed a motion to voluntarily dismiss its appeal in the Commonwealth Action, and that the First Circuit had allowed the motion and entered Judgment accordingly.  (Docket No. 96 at Ex. A).  The record does not indicate why the Commonwealth decided to abandon its appeal.  In any event, as a result of that action, Judge Stearns' decision in the Commonwealth Action remains unchallenged, and the issues presented on summary judgment in the present case must now be decided without the benefit of a ruling from the First Circuit.

After careful consideration of the undisputed facts set forth in the record, as well as the parties' written submissions and their oral arguments, this court finds that HERA's anti-injunction clause bars this court's jurisdiction over the claims asserted in Count I of the Sueros' complaint.  Therefore, and for all the reasons set forth below, the plaintiffs' motion for partial summary judgment as to Count I is DENIED, and the defendants' cross-motion for partial summary judgment as to Count I is ALLOWED.

## II.  STATEMENT OF FACTS[3]

The following facts are undisputed unless otherwise indicated.

### The Parties

The plaintiffs, Ramon and Rosanna Suero, are the former owners and current occupants of residential property that is located on Elder Street in Dorchester, Massachusetts (the "Property").  (PF ¶ 1).  The Sueros purchased the Property for $283,000 on August 31, 2005.  (Id. ¶ 3).  They refinanced their mortgage approximately two years later, on August 7, 2007.  (Id. ¶ 4).  In connection with the refinancing, the Sueros granted a mortgage to the Mortgage Electronic Registration System for $298,000.  (Id.).  The mortgage was subsequently assigned to Ocwen Loan Servicing, LLC ("Ocwen"), which became the servicer of the loan.  (See id. ¶ 5; DR ¶ 5; Compl. (Docket No. 1) at Ex. I ¶ 2).  This case arises out of events that occurred after the Sueros defaulted on their mortgage and Ocwen foreclosed on their home.

The defendant, Freddie Mac, is a government-sponsored enterprise ("GSE"), which Congress created, along with Fannie Mae, in order to "'establish secondary market facilities for

---

[3]  Unless otherwise indicated, the facts are derived from the following materials: (1) "Plaintiffs' Concise Statement of Material Facts in Support of Their Motion for Partial Summary Judgment" ("PF") and the exhibits attached thereto ("Pl. Ex. __") (Docket No. 46-1 through 46-4); (2) the exhibit attached to the "Plaintiffs' Memorandum of Law in Support of Their Motion for Partial Summary Judgment" ("Pl. Supp. Ex. A") (Docket No. 46-6); (3) the exhibits attached to Freddie Mac's and FHFA's "Combined Memorandum in Support of Cross-Motions for Partial Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment" ("Def. Ex. __") (Docket No. 64-1 through 64-3); (4) Freddie Mac's and FHFA's response to the plaintiffs' Concise Statement of Material Facts ("DR"), which is set forth at pages 1 through 10 of Freddie Mac's and FHFA's "Statement of Disputed and Undisputed Material Facts" (Docket No. 65); (5) the Defendant's Facts ("DF"), which are set forth on pages 10 through 12 of Freddie Mac's and FHFA's "Statement of Disputed and Undisputed Material Facts" (Docket No. 65); (6) the exhibits attached to the Second Declaration of Gregory S. Bombard ("Def. Supp. Ex. __") (Docket No. 67); (7) the Plaintiff's Supplemental Statement of Facts ("PSF"), which is set forth on pages 1-3 of their "Supplemental Statement of Disputed and Undisputed Material Facts" (Docket No. 84-2); (8) the plaintiffs' response to the defendants' facts ("PR"), which is set forth on pages 3-9 of their "Supplemental Statement of Disputed and Undisputed Facts" (Docket No. 84-2); (9) the exhibits attached to the plaintiffs' "Supplemental Statement of Disputed and Undisputed Facts" ("Pl. 2d Supp. Ex. __") (Docket No. 84-3); and (10) the exhibits attached to the "Plaintiffs' Sur-Reply in Further Support of Their Motion for Partial Summary Judgment" ("Pl. 3d Supp. Ex. __") (Docket No. 88-1 through 88-2).

residential mortgages,' 'provide stability in the secondary market for residential mortgages,' and 'promote access to mortgage credit throughout the Nation.'"  Fed. Hous. Fin. Agency v. City of Chicago, 962 F. Supp. 2d 1044, 1048 (N.D. Ill. 2013) (quoting 12 U.S.C. § 1716).  The GSEs have worked toward achieving these goals by "buy[ing] residential mortgages from banks, repackag[ing] them for sale as mortgage-backed securities, and guarantee[ing] these securities by promising to make investors whole if borrowers default." Id. (quoting Judicial Watch, Inc. v. FHFA, 646 F.3d 924, 925 (D.C. Cir. 2011)).  Together, "Freddie Mac and Fannie Mae own or guarantee roughly half of the outstanding residential mortgage loans in the United States." Massachusetts v. Fed. Hous. Fin. Agency, 54 F. Supp. 3d at 96.  Since September 10, 2007, Freddie Mac has been the investor on the Sueros' mortgage loan, and the holder of the promissory note for the loan.  (PF ¶ 6; DR ¶ 6).

The intervenor, FHFA, is a federal agency that was created pursuant to HERA as "the safety, soundness, and housing mission regulator" of Fannie Mae and Freddie Mac.  (See Pl. 3d Supp. Ex. A at 11).  In addition to its role as the regulator of the GSEs, FHFA has the power to be appointed as a conservator or receiver of Fannie Mae and Freddie Mac "for the purpose of reorganizing, rehabilitating, or winding up the affairs" of those entities.  See 12 U.S.C. § 4617(a)(2).  Since September 2008, FHFA has held Fannie Mae and Freddie Mac in conserva-torship with the goal of preserving and conserving their assets and property, putting them in a "sound and solvent condition[,]" and restoring confidence in the GSEs.  (Pl. 3d Supp. Ex. A at 12).  A critical issue in this case is whether FHFA's status as the Conservator for Freddie Mac strips this court of subject matter jurisdiction over Count I of the Sueros' complaint.  For the reasons described below, this court finds that it does.

6

**The Sueros' Involvement with BCC**

In September 2010, Ocwen foreclosed on the plaintiffs' mortgage, and Freddie Mac took title to the Property.  (PF ¶ 5; DR ¶ 5; Compl. ¶ 5; Answer (Docket No. 24) ¶ 5).  Although the Sueros no longer own the Property, they have continued to reside there since the foreclosure. (See PF ¶ 21; DF ¶ 32).  They have also made monthly use and occupancy payments to Freddie Mac since October 2012.  (See PF ¶ 21; Compl. ¶¶ 11, 14; Answer ¶¶ 11, 14).  According to the plaintiffs, those payments have amounted to $700 per month.  (PF ¶ 21; PSF ¶ 4).

In about December 2011, the Sueros applied and received approval from BCC for a mortgage loan to repurchase the Property.  (PF ¶ 7).  BCC is a non-profit community financial development institution that is exempt from taxation under section 501(c)(3) of the Internal Revenue Code.  (Id.; Pl. 2d Supp. Ex. 1).  Its aim is to build healthy communities in areas where low-income people live and work.  (Pl. Ex. 3 ¶ 2).  In an effort to achieve that goal, BCC has implemented what is known as its Stabilization Urban Neighborhoods (SUN) Initiative.  (See id. ¶¶ 1-3; Pl. Supp. Ex. A at 1).  Through its SUN Initiative, BCC assists struggling homeowners in their efforts to avoid foreclosure or otherwise stabilize their housing situation by purchasing their properties and renting or selling those properties back to the homeowners with a mortgage that they can afford.  (Pl. Ex. 3 ¶ 3; PF ¶ 16).  According to the former Attorney General of Massachusetts, as of May 2014, BCC's SUN Initiative had enabled approximately 500 Massachusetts families to remain in their homes.  (Pl. Supp. Ex. A at 1-2).

Section 35C(h) of the Massachusetts Foreclosure Law "is tailored to support programs like the SUN Initiative by barring mortgage creditors from setting restrictive conditions on the sale of residential properties to non-profit organizations like BCC that give preferences to

existing homeowners." <u>Massachusetts v. Fed. Hous. Fin. Agency</u>, 54 F. Supp. 3d at 96.

Specifically, the statute provides:

> In all circumstances in which an offer to purchase either a mortgage loan or residential property is made by an entity with a tax-exempt filing status under section 501(c)(3) of the Internal Revenue Code, ... no creditor shall require as a condition of sale or transfer to any such entity any affidavit, statement, agreement or addendum limiting ownership or occupancy of the residential property by the borrower and, if obtained, such affidavit, statement, agreement or addendum shall not provide a basis to avoid a sale or transfer nor shall it be enforceable against such acquiring entity or any real estate broker, borrower or settlement agent named in such affidavit, statement or addendum.

Mass. Gen. Laws ch. 244, § 35C(h).  In Count I of their complaint, the Sueros claim that Freddie Mac violated this provision when it refused BCC's offers to purchase the foreclosed Property at fair market value.

### Freddie Mac's Refusal to Sell the Property to BCC

BCC's subsidiary, NSP Residential, LLC ("NSP"), is the entity responsible for funding and facilitating purchases of properties as part of the SUN Initiative.  (Pl. Ex. 3 ¶ 4).  Both BCC and NSP have been working with the plaintiffs since the end of 2011.  (Id. ¶ 5).  Between February 2012 and August 2013, NSP made various efforts to purchase the Property from Freddie Mac for the purpose of reselling it to the Sueros.  (PF ¶¶ 9-13; DR ¶¶ 9-13; DF ¶¶ 28-29, 31; PR ¶¶ 15-16, 18).  Thus, over the course of that time period, NSP made a series of offers to Freddie Mac, which ranged from $80,000 in cash to $115,000 in cash.  (PF ¶¶ 9-13; DR ¶¶ 9-13).  Each of the offers was contingent upon the Sueros' ability to remain on the Property, and was made with full disclosure of BCC's intent to resell the Property back to the former homeowners.  (<u>See</u> DF ¶ 29; PF ¶¶ 9-13, 16; DR ¶¶ 9-13, 16).

As NSP stated in its offer letters to Freddie Mac, acceptance of one of its offers would have enabled the defendant to avoid the costs of evicting the Sueros from the Property, as well as the costs associated with management and maintenance of the Property pending its sale to another purchaser.  (See Pl. Ex. 3 at attachments A-C).  In addition, it would have enabled Freddie Mac to dispose of real estate that was located in one of the Commonwealth's "hardest hit areas in terms of foreclosures, abandoned and vacant properties."  (See id. at attachments A-B).  According to an assessment that was performed by Freddie Mac's broker during the relevant time period, the Property had a fair market sales value that fell within the range of $110,000 to $115,000.  (Compl. at Ex. J).  Therefore, NSP's offer to pay up to $115,000 in cash was consistent with or better than the price that Freddie Mac could reasonably have expected to receive from an alternative purchaser.  (See PF ¶ 13; DR ¶ 13).  Nevertheless, Freddie Mac rejected each of NSP's offers, and informed BCC that it would accept nothing less than a full payoff of the outstanding debt that was owed by the Sueros on their mortgage loan.  (See PF ¶ 17; DR ¶ 17; Def. Supp. Ex. G).

### Freddie Mac's Arms-Length Transaction and Make-Whole Policies

There is no dispute that Freddie Mac refused to sell the Property to BCC because the proposed sales did not comply with its "arm's length transaction" ("ALT") policy or its "Make-Whole" policy.[4]  (See PF ¶¶ 18-19; DR ¶¶ 18-19; Def. Supp. Ex. G; DF ¶¶ 24-25).  Under the ALT

---

[4] Initially, Freddie Mac provided alternative reasons for its failure to consider BCC's offers to purchase the Property.  However, for purposes of summary judgment, Freddie Mac does not dispute that it acted pursuant to its ALT and Make-Whole policies, which prohibited it from selling foreclosed property to entities that intended to re-sell the property to the borrower.

policy, Freddie Mac required all parties to a short sale,[5] or to a real estate owned ("REO") sale,[6] to execute an affidavit stating that the sale was an arm's length transaction, and that the borrower would not remain on the property for more than 90 days or subsequently repurchase the property from the buyer.  (See PF ¶ 19; DR ¶ 19; Def. Mem. at 4-5).  Under the Make-Whole policy, Freddie Mac refused to sell property to any entity that intended to resell the property to the borrower unless the purchaser paid the full amount that was outstanding on the loan.  (See DF ¶ 24; Def. Supp. Ex. G; PSF ¶¶ 5-7).  Because BCC intended to re-sell the Property to the Sueros, and was unwilling to purchase the Property for the full amount owed on the plaintiffs' loan at the time of the foreclosure, Freddie Mac declined to accept any of its offers.  (See PF ¶ 19; DR ¶ 19; Def. Supp. Ex. G; PSF ¶ 8).  The plaintiffs contend that Freddie Mac's refusal to accept BCC's offers to purchase the Property at fair market value, merely because BCC intended to resell the Property to the plaintiffs, was unlawful under Section 35C(h) of the Massachusetts Foreclosure Law, and constituted an unfair or deceptive act or practice that violated Chapter 93A.

While there is no genuine dispute that Freddie Mac was acting in accordance with its ALT and Make-Whole policies when it rejected BCC's offers, the parties disagree as to whether FHFA directed the defendant to adopt those policies, or was otherwise acting as Freddie Mac's Conservator with respect to the events giving rise to this case.  According to the Sueros, Freddie Mac was carrying out its independent business practices at all times relevant to this action, and

---

[5]  As Freddie Mac and FHFA have explained in their summary judgment papers, a "short sale" involves a pre-foreclosure sale of property "in which proceeds from selling the property are less than the outstanding debt secured by the liens against the property and where the lien holders agree to release their lien on the property and accept less than the amount owed on the debt."  (Def. Mem. at 4 n.3).

[6]  An "REO" sale involves a post-foreclosure sale of property by the lender.  (Def. Mem. at 5 n.5).

its rejection of BCC's offers to purchase the Property involved no affirmative conduct or

exercise of power by FHFA in its capacity as Conservator.  (Pl. Sur-Reply (Docket No. 88) at 2-6).

If this were the case, HERA's anti-injunction provision would not apply.  However, the defen-

dants dispute the plaintiffs' characterization of Freddie Mac's actions as being independent

from FHFA.  They contend that Freddie Mac's policies have been approved by FHFA, in its role

as the GSE's regulator and Conservator, and that FHFA has endorsed those policies as a means

to preserve and conserve the assets of the conservatorship. (See DR ¶¶ 18-19; Def. Mem. at

4-5).  This is substantially the same issue that was raised by the parties in the Commonwealth

Action.  There, Judge Stearns determined that FHFA had exercised its powers or functions as a

Conservator, not by issuing a formal statement or directive, but by adopting the rationale

behind the ALT and Make-Whole policies and continuing to support the application of those

policies.  See Massachusetts v. Fed. Hous. Fin. Agency, 54 F. Supp. 3d at 99.  As detailed below,

this court agrees with Judge Stearns' reasoning in that case, and finds that it applies equally to

the undisputed facts presented here.

Additional factual details relevant to this court's analysis are described below where

appropriate.

### III.  ANALYSIS

#### A.    Summary Judgment Standard of Review

Each of the parties has moved for summary judgment with respect to the Sueros' claim,

set forth in Count I of their complaint, that Freddie Mac violated Section 35C(h) and Chapter

93A by refusing to sell the Property to BCC because BCC expressed an intent to resell the

Property to the Sueros.  "The role of summary judgment is 'to pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citations omitted).  The burden is on the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).  "'When facing cross-motions for summary judgment, a court must

rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'" Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

### B.      HERA's Anti-Injunction Provision

The threshold question raised by the parties on summary judgment is whether HERA's anti-injunction provision, 12 U.S.C. § 4617(f), bars this court from granting the relief requested by the Sueros under Count I of their complaint.  The plaintiffs are seeking equitable relief in the form of an order directing Freddie Mac to sell the Property to BCC.  (See Pl. Mem. (Docket No. 46-5) at 1-2).  The defendants contend that HERA precludes such an order because it would interfere with FHFA's exercise of authority as Conservator to promote Freddie Mac's imple-mentation of the ALT and Make-Whole policies, and to dispose of Freddie Mac's assets in the manner that it deems appropriate.  (See Def. Mem. at 9-12).  This court finds that FHFA's promotion of Freddie Mac's REO policies falls within the scope of its statutory authority as a Conservator, and that this court lacks jurisdiction over Count I of the Sueros' complaint.

### Scope of the Anti-Injunction Clause

Section 4617(f) of HERA "substantially limits judicial review of FHFA's actions as conservator" of Fannie Mae and Freddie Mac.  Cty. of Sonoma v. Fed. Hous. Fin. Agency, 710 F.3d 987, 990 (9th Cir. 2013).  It provides in relevant part that "no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver."  12 U.S.C. § 4617(f).  However, the anti-injunction provision "is inapplicable when FHFA acts beyond the scope of its conservator power."  Id. at 992.  Accordingly, the critical issue

is whether FHFA was exercising its statutory powers or functions as Freddie Mac's Conservator with respect to the ALT and the Make-Whole policies.  This court finds that the question must be answered in the affirmative.

### FHFA's Role as Conservator of the GSEs

FHFA has been granted "broad powers" in its role as the Conservator of Fannie Mae and Freddie Mac.  Id. at 989.  Thus, as Conservator, FHFA succeeds to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity[.]"  12 U.S.C. § 4617(b)(2)(A)(i).  It is also empowered to carry out a number of specific activities, which are described in section 4617 of HERA.  Of particular relevance to this case is HERA's grant of authority to FHFA, as Conservator, to "take such action as may be – (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and *preserve and conserve the assets and property of the regulated entity*."  Id. § 4617(b)(2)(D) (emphasis added).  Also relevant is that HERA grants FHFA the discretion to "transfer or sell any asset or liability of the regulated entity . . . *without any approval, assignment, or consent with respect to such transfer or sale*.  Id. § 4617(b)(2)(G) (emphasis added).   The defendants argue that a court order compelling Freddie Mac to sell the Property to BCC for resale to the Sueros would restrain the Conservator's ability to carry out both of these statutory powers.  (Def. Reply Mem. (Docket No. 85) at 4-5).  Therefore, they contend that HERA's jurisdictional bar applies to the facts of this case.  (See id. at 3-6).

**FHFA's Endorsement of the ALT and Make-Whole Policies**

It is undisputed that courts have applied HERA's anti-injunction clause "only where FHFA took clear, decisive and affirmative action – including issuing a formal directive to the [GSEs]." (See Pl. Opp. Mem. (Docket No. 84-1) at 10-11).  While the plaintiffs do not dispute that HERA gives FHFA broad powers in its capacity as Fannie Mae's and Freddie Mac's Conservator, they argue that there has been no showing that FHFA directed or took any affirmative action with regard to Freddie Mac's adoption of the ALT and Make-Whole policies as applied to post-foreclosure, REO sales.  (See id. at 1, 5-11).  Therefore, the plaintiffs contend, HERA does not apply to this case.  (Id. at 9-11).  This court does not agree, although it does not find all the defendants' arguments persuasive.

The defendants point to a July 3, 2012 email from FHFA to the GSEs as evidence that FHFA, in its capacity as Conservator, "directed the [GSEs] not to sell foreclosed real estate at current fair market value to non-profit entities that intend to resell the property to the former borrower for less than the amount owed on the mortgage."  (See Def. Mem. at 1, 4-5).  That email provides in relevant part as follows:

> As part of the Servicing Alignment Initiative, FHFA directed the [GSEs] to develop consistent requirements for servicing *non-performing loans*.  Those discussions have resulted in an aligned set of policies *for short sales*, summarized in the attached guidances, policies and related information.  On behalf of FHFA, acting as conservator, the [GSEs] are directed to implement these Aligned *Short Sale* Policies.

(Def. Ex. A (emphasis added)).  Since, however, the email makes no mention of the ALT and Make-Whole policies, and, by its terms, does not relate to post-foreclosure practices, this court concludes that the email does not evidence a directive to the GSEs relating to restrictions on post-foreclosure sales.

The defendants' more persuasive argument is that the application of HERA's anti-injunction clause is not confined to situations in which FHFA engages in affirmative acts by issuing specific directives or statements instructing the GSEs to implement specified policies. (See Def. Reply Mem. at 1-2, 4).  As Judge Stearns reasoned in the Commonwealth Action, "the application of HERA's Anti-Injunction Clause is not limited to instances in which FHFA issues formal directives.  Rather, by its own terms, it extends to any 'exercise of powers or functions of [FHFA] as a conservator.'"  Massachusetts v. Fed. Hous. Fin. Agency, 54 F. Supp. 3d at 99 (quoting 12 U.S.C. § 4617(f)).  While FHFA may not have "acted" by issuing a formal statement or directive relative to sales of foreclosed homes, this court finds that it has exercised its statutory power as a Conservator with respect to such sales.

As was the case in the Commonwealth Action, the record before this court shows that FHFA "has adopted the policy and rationale of the GSEs with respect to the ALT and Make-Whole requirements."  Id.  Specifically, in a letter dated January 31, 2013 from FHFA's General Counsel to the Massachusetts Attorney General's Office, FHFA's Counsel explained as follows:

> *FHFA and the GSEs believe that the requirement for an affidavit that the sale is an arm's length transaction helps to prevent mortgage fraud and protect homeowners and communities*.  Prior to the requirement, the [GSEs] became aware of instances where nonprofit entities purchased the homes of certain borrowers following a short sale and resold the homes back to the former borrowers at an amount less than the mortgage debt outstanding, but at a profit to the entity.  Additionally, fostering this type of transaction could lead to sham nonprofits created just for this purpose and potentially harming homeowners as well.
>
> Also, there are concerns that in many cases, these borrowers were eligible for a loan modification that they would avoid in order to secure a repurchase from a nonprofit at a larger discount and without other obligations that exist, including second liens.  This would run counter to federal and state efforts to provide homeowners an "affordable" alternative to foreclosure; these programs are not designed to provide [the] "cheapest" program as that

> result would increase costs to taxpayers and to neighborhoods through
> further depressed home prices.

(Def. Ex. C at 2-3 (emphasis added)).  Although these statements were made in the context of a

discussion about short sales, the FHFA has asserted that these concerns are equally applicable

to REO sales.  (See Def. Mem. at 5; Def. Reply Mem. at 6 n.3 (noting that short sales and post-

foreclosure, REO sales "are susceptible to the same exact risks")).  Thus, "FHFA's General

Counsel [has] made it clear that the FHFA endorses the [ALT and Make-Whole] restrictions" as a

means of protecting the GSEs against fraud and preventing situations that encourage distressed

homeowners "to submit to an otherwise avoidable foreclosure on a mortgage in anticipation of

later repurchasing the home at a lower price from the non-profit intermediary entity."  Massa-

chusetts v. Fed. Hous. Fin. Agency, 54 F. Supp. 3d at 99, 101.  "Courts have uniformly held that

the FHFA is acting as the GSEs' conservator when it evaluates the risks of certain business

transactions and takes prudential action to avoid those that it deems undesirable."  Id. at 100.

There can be little doubt that FHFA's endorsement of the ALT and Make-Whole policies as a

means of preventing the risks articulated by its General Counsel relates directly to its role as the

GSEs' Conservator, and that the relief the Sueros are seeking in this case would interfere with

the Agency's actions in that capacity.  See id. at 101 ("Because defendants have articulated a

potential risk of financial loss in abiding by the restrictions of [Section 35C(h)], the decision to

reject these terms may fairly be characterized as a business judgment intended to 'preserve

and conserve [the GSEs'] assets and property.'  12 U.S.C. § 4617(b)(2)(D)(ii)").

FHFA's support for the ALT and Make-Whole restrictions, as applied to REO sales, is also

demonstrated by its efforts to defend Freddie Mac against the legal challenges that have been

brought against it under Section 35C(h) of the Massachusetts Foreclosure Act and Chapter 93A.

Thus, in the Commonwealth Action, as in this case, FHFA (along with Fannie Mae and Freddie

Mac) defended the Commonwealth's claims that the GSEs had violated Section 35C(h) and

Chapter 93A by refusing to sell foreclosed homes to BCC based on the ALT and Make-Whole

policies.  See id. at 99.  The defendants maintained that HERA barred the court from reaching

the merits of the Commonwealth's claims, arguing that "FHFA, in directing the GSEs to

implement and enforce the ALT and the Make-Whole restrictions, acted within the scope of its

powers and duty as conservator to 'preserve and conserve' the GSEs' assets."  Id. at 97.

Accordingly, FHFA took the position that it was actively supporting GSEs' use of the ALT and

Make-Whole policies with respect to REO sales, as a means of carrying out its responsibilities as

the Conservator.[7]  Id.

     In the instant case, FHFA has continued to defend Freddie Mac's use of the ALT and

Make-Whole policies with respect to REO sales.  Thus, it has "'act[ed]' by affirmatively

supporting the continued application of the restrictions" to both pre- and post-foreclosure

sales.  Id. at 99.  Under such circumstances, an injunction compelling Freddie Mac to sell the

Property to BCC would restrain or affect FHFA's power, as the Conservator of Freddie Mac, to

"transfer or sell any asset . . . of the regulated entity . . . without any approval, assignment, or

consent with respect to such transfer or sale."[8]  12 U.S.C. § 4617(b)(2)(G).  Therefore, this court

is without authority to consider the Sueros' claims under Section 35C(h) and Chapter 93A.

---

[7] There is no dispute that FHFA has the authority to issue policy directives in its capacity as the Conservator of the GSEs.  Therefore, as Judge Stearns noted in his decision in the Commonwealth Action, "if there is a procedural deficiency in the issuance of the ALT and Make-Whole restrictions, [FHFA] could remedy it tomorrow, presumably *nunc pro tunc*."  Massachusetts. v. Fed. Hous. Fin. Agency, 54 F. Supp. 3d at 99 n.3.

[8] "The power to freely dispose of property necessarily encompasses the power *not to* dispose of property." Massachusetts v. Fed. Hous. Fin. Agency, 54 F. Supp. 3d at 101 n.8.  Therefore, FHFA's power as Conservator includes the authority to decline offers to purchase property owned by the GSEs.

## FHFA's Delegation of Authority to the GSEs

In an effort to overcome HERA's anti-injunction clause, the Sueros contend that FHFA has disclaimed any conservatorship authority over Freddie Mac's REO sales practices.  Relying on two 2012 reports from FHFA's Office of Inspector General ("OIG"), the plaintiffs maintain that FHFA has delegated authority for most day-to-day business decisions to Fannie Mae and Freddie Mac, including decisions regarding sales of REO properties.  (Pl. Sur-Reply at 3-4).  They further reason that the Agency's failure to review, approve, or even acknowledge Freddie Mac's REO policies, after delegating authority over such policies to the GSEs, undermines any conclusion that the Agency has exercised its powers as a Conservator with respect to such policies.  (Id. at 4-6).  After consideration of the OIG reports, this court concludes that the Sueros' argument is not persuasive.

As the OIG reports describe, following the enactment of HERA in July 2008, FHFA took Fannie Mae and Freddie Mac into conservatorship.  (Pl. 3d Supp. Ex. B at 5).  Subsequently, however, it delegated broad authority back to the GSEs.  (Id.).  In doing so, FHFA determined that the GSEs should remain "responsible for normal business activities and day-to-day operations[.]"  (Id.).  According to the OIG reports, such business activities include "decisions about individual mortgages, property sales, or foreclosures[.]"  (Id.).

While the OIG reports support the Sueros' assertion that FHFA delegated most ordinary business decisions back to the GSEs, they also show that the Agency, in its capacity as Conservator, has retained the ability to control many aspects of the GSEs' operations.  For example, FHFA has maintained full authority over various business activities such as actions involving capital stock, dividends, and material changes in accounting policy; decisions regarding the

creation of subsidiaries or affiliates; actions involving benefits for directors and officers at

certain levels within the GSEs; settlements in excess of $50 million; and mergers with

businesses involving over $50 million.  (Id. at 5-7).  Notably, FHFA has also "retain[ed] the right

to review and reverse any delegated action[,]" including its delegation of day-to-day operations

to the GSEs, as well as "broad authority to review any activity or transaction at any time."  (Id.).

Accordingly, nothing in the OIG reports undermines FHFA's ability, as Conservator, to review

Freddie Mac's REO sales policies, or to endorse those policies as a means of carrying out its

statutory powers under HERA.

Nevertheless, the plaintiffs insist that the record contains no evidence demonstrating

that FHFA actually undertook a review of Freddie Mac's REO policies or issued any statement

approving those policies.  (Pl. Sur-Reply at 5).  Thus, they argue that "the policies were squarely

Freddie Mac's own, and FHFA exercised no conservator powers."  (Id. at 6).  However, the

plaintiffs' assertion is premised upon the assumption that FHFA is required to perform a formal

review, or issue a formal approval, before it can exercise its conservatorship powers.  As

explained above, nothing in HERA or the OIG reports imposes such a requirement upon the

defendant.

Finally, this court is not persuaded by the Sueros' warnings about the potential policy

implications of applying the anti-injunction clause to the facts of this case.  As the plaintiffs

portray the situation:

> By asking this Court to apply the anti-injunction provision to the private
> business practices of Freddie Mac, Defendants are seeking to dramatically
> expand the scope of the provision, insulating from judicial review every
> single private business activity of the [GSEs].  By this logic, Freddie Mac could
> decline to follow the State Sanitary Code – it could decide, for example, not
> to repair broken furnaces or exterminate bedbugs, and no court could issue

>an injunction requiring it to do so.  The [GSEs] could also choose to simply
>change the locks rather than undertake judicial proceedings when evicting
>tenants, and the courts would be barred from ordering otherwise.  Freddie
>Mac's contractual obligations would likewise be rendered unenforceable.  By
>Defendants' logic, all such claims would be above judicial review.

(Pl. Sur-Reply at 3).

The plaintiffs' argument is speculative at best.  Admittedly, HERA is a statute of "extraordinary breadth" involving the "'sweeping ouster of courts' power to grant equitable remedies[.]'"  Perry Capital LLC v. Lew, 70 F. Supp. 3d 208, 225, 226 (D.D.C. 2014) (quoting Freeman v. Fed. Deposit Ins. Corp., 56 F.3d 1394, 1398 (D.C. Cir. 1995)).  Notwithstanding HERA's breadth, however, "FHFA's powers as conservator are not limitless[.]"  Cty. of Sonoma, 710 F.3d at 993.  Without purporting to decide the matter, the scenarios described by the Sueros could be challenged as failing to promote the Agency's mandate to "preserve and conserve the assets and property of [Freddie Mac]" or as exceeding the scope of FHFA's authority as Conservator, among other grounds.  See 12 U.S.C. § 4617(b)(2)(D).  Here, in contrast, the defendants have demonstrated how FHFA's adoption of the ALT and Make-Whole policies furthers its statutory mission as a protective conservator.  That is enough to preclude judicial intervention.  See Perry Capital, 70 F. Supp. 3d at 226 ("Generally, it is not the Court's place to substitute its judgment for FHFA's, let alone in the face of HERA's sweeping ouster of courts' power to grant equitable remedies.") (internal quotations, punctuation and citation omitted).  Because section 4617(f) "substantially limits judicial review of FHFA's actions as conservator[,]" it bars the relief sought by the Sueros pursuant to Count I of their complaint.  Therefore, the defendants are entitled to judgment as a matter of law.  See Cty. of Sonoma, 710 F.3d at 990.

## IV.  <u>CONCLUSION</u>

For all the reasons detailed herein, the "Plaintiffs' Motion for Partial Summary Judgment" as to Count I (Docket No. 46) is DENIED, and the defendants' "Cross-Motion for Partial Summary Judgment" (Docket No. 63) as to Count I is ALLOWED.

<u>/ s / Judith Gail Dein</u>
Judith Gail Dein
United States Magistrate Judge